## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **CHRIS WOODFIELD, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**TWITTER, INC., X CORP., X HOLDINGS I, INC., X HOLDING CORP., AND ELON MUSK,**<br><br>**DEFENDANTS.** | **C.A. NO. 1:23-**<br><br>**JURY TRIAL DEMANDED** |

1.     Plaintiff Chris Woodfield ("Plaintiff" or Mr. Woodfield") files this Complaint ("Complaint") against Defendants Twitter, Inc. ("Twitter"), X Corp., X Holdings I, Inc. ("X Holdings I"), X Holdings Corp.,1 and Elon Musk ("Musk") (collectively, "Defendants"), and would respectfully show as follows:

### I.     INTRODUCTION

2.     This action arises out of Defendants' attempts to avoid paying Twitter's ex-employees the severance Defendants promised them – attempts which began with Twitter's refusal to pay the severance it repeatedly promised its employees, and which have morphed, in the months since the employees began to take action to recover what they are owed, into an outright refusal to follow the terms of

---

1 As discussed below, Twitter appears to have merged into X Corp., with X Corp. as the surviving corporation, and X Holdings I appears to have merged into X Holding Corp., with X Holding Corp. as the surviving corporation. Twitter, Inc. and X Holdings I are included as respondents here in an abundance of caution, and references to "Twitter" and "X Holdings I" include the merged successor corporation where appropriate or required.

the Dispute Resolution Agreements ("DRAs") Twitter imposed upon Plaintiff and members of the Class defined below.

3.   Twitter made its promises to pay severance many times and in many ways. Twitter made these promises to their employees (colloquially and internally known as "Tweeps") in their initial offer letters. Twitter made this same promise explicit in its agreement to sell the company to Elon Musk ("Musk"), negotiating for a clause in the agreement that protected its employees by ensuring that they would receive severance at least as favorable during the post-merger period as they had under the old management. And Twitter went out of its way to make additional promises and representations to its employees to allay their concerns in advance of its purchase by Musk and convince them to stay employed at Twitter pending the close of that transaction.

4.   Twitter broke all these promises, breaching their enforceable agreements with its former employees in the process.

5.   The saga surrounding this breach of faith began in late March 2022, when Musk issued vehement criticism of Twitter's content moderation decisions. Shortly thereafter, Musk disclosed that he had purchased a 9.2% stake in the company. Next, after declining a position on Twitter's Board of Directors, he announced his intention to purchase Twitter and take it private.

6.   On April 14, 2022, Musk offered to purchase Twitter at $54.20 per share. After some back and forth, on April 25, 2022 Twitter's Board of Directors announced that it had voted to approve the sale. Musk, along with his companies X Holdings I (as the "Parent") and X Holdings II, Inc. (the "Acquisition Sub") entered into a merger agreement with Twitter dated as of April 25, 2022, by which the Acquisition Sub would merge with Twitter, with Twitter surviving as a wholly owned subsidiary of X Holdings I (the "Merger Agreement").

7.   As relevant here, the Merger Agreement included the parties' agreement, in Section 6.9(a), that for the one-year period following the closing of the merger, X Holdings I would cause Twitter to provide any remaining Tweeps with "severance payments and

benefits … no less favorable than" those provided under Twitter's policies – written or unwritten – immediately prior to the merger.

8.   Twitter communicated that commitment to its employees almost immediately. By April 26, 2022 – the day after the Merger Agreement was announced – it had already published an "Acquisition FAQ" to its employees that specifically told Tweeps that "[t]he terms of the agreement specifically protect Tweep benefits, base salary, and bonus plans (short/long term incentive plans) so that they cannot be negatively impacted for at least one year from the closing date." And Twitter represented that "[i]n the event of a layoff, any employee whose job is impacted would be eligible for severance."

9.   That April version of the Acquisition FAQ also told employees that, in the event of layoffs after the acquisition, all unvested equity awards ("RSUs") would likely be forfeited: "Generally speaking, all unvested awards including RSUs are forfeited once a Tweep is no longer a service provider per the terms of the 2013 Equity Incentive Plan." But Twitter swiftly and specifically reassured Tweeps that, given the terms of the Merger Agreement protecting Twitter's severance policy, that was ***not*** what would happen to them if Twitter carried out a layoff after the merger closed.

10.    Instead, after Twitter published the Acquisition FAQ and held all-hands meetings in which Twitter specifically promised Tweeps that the Merger Agreement protected their severance, employees asked Twitter to commit its severance policy to writing, and Twitter did so. Twitter explicitly represented in a May email that its severance policy was to provide "at a minimum" (1) two months base salary (or incentive-based salary for sales employees), (2) pro-rated performance bonuses as though all triggers for such bonuses had been hit, (3) the cash value of any RSUs that would have vested within three months of separation, and (4) a cash contribution for the continuation of healthcare coverage (the "Severance Package"). Twitter later incorporated that communication into a June update to the Acquisition FAQ and repeated it in another update in October 2022, just days prior to the merger's close date.

11.    Those communications were made at a time of significant uncertainty and employee concern – among other things, Musk and Twitter were litigating over whether Musk could escape his agreement to purchase Twitter – and, on information and belief, were made in order to assuage that concern and convince Twitter employees to stay at Twitter through the merger.

12.    As detailed below, that worked; Plaintiff relied on Twitter's representation that he would have a safety net if he was terminated after the merger as part of him decision to remain at Twitter.

13.    On January 4, 2023, after the close of the merger, Plaintiff was laid off by Twitter. Yet Twitter has refused to provide him with the severance it promised.

## II.    Twitter's Breach of the Dispute Resolution Agreement

14.    Twitter's letter to Plaintiff offering him employment (the "Offer Letter") contained a Dispute Resolution clause which read, in its entirety, as follows:

*15. **Dispute Resolution**. We sincerely hope that no dispute will arise between us. If a dispute should arise, it will be resolved through the Company's Dispute Resolution Agreement, unless you choose to opt-out of the same pursuant to its terms. A copy of the Dispute Resolution Agreement is enclosed with this letter.*

(emphasis added)

15.    A copy of Twitter's Dispute Resolution Agreement ("DRA"), which provides for arbitration with JAMS, was attached to that offer letter.

16.    Twitter's Offer Letter communicated to Plaintiff that executing the DRA was a condition of employment.

17.    Plaintiff signed the DRA through Adobe's Adobe Sign process prior to beginning his employment.

18. Despite a diligent search, Plaintiff was unable to locate his countersigned DRA prior to commencing his arbitration with JAMS on May 6, 2023.

19. In the absence of his countersigned DRA, Plaintiff included the copy of his DRA that bore Twitter's signature but not his own when he filed his Demand for Arbitration (the "Demand").

20. In his Demand, Plaintiff affirmatively pleaded that he had signed the DRA but was unable to locate his own countersigned copy.

21. On May 23, 2023, Defendants objected to Plaintiff's demand for arbitration on the basis that the DRA drafted and executed by Twitter, in which Twitter specified JAMS as the sole arbitration provider for any disputes between Plaintiff and Twitter, was not sufficient to allow JAMS to take jurisdiction over Plaintiff's dispute.

22. Defendants did not contend that no signed DRA exists.

23. Defendants did not affirm that they diligently searched their files for Plaintiff's DRA.

24. Defendants did not affirm that they were unaware of the location of Plaintiff's DRA, were unable to find it, or had any doubts whatsoever as to its existence or contents.

25. Indeed, Defendant Twitter had previously affirmatively represented to another federal court that it maintained a copy of each employee's DRA in its files.

26. In support of that representation, Twitter submitted a declaration that laid out, in excruciating detail, the process by which Twitter ensured that it maintained a file copy of the DRA executed by every employee who received an offer of employment contingent on the execution of a DRA, such as Plaintiff.

27. At the time Twitter objected to JAMS taking jurisdiction over the arbitration, Twitter was fully aware that Plaintiff's DRA, which explicitly provided for arbitration with JAMS, was in its files, and that it was obligated to arbitrate with Plaintiff at JAMS.

28.   Defendants refused to live up to that obligation.

29.   Although Plaintiff affirmatively plead that he had signed the DRA, Twitter maintained that Plaintiff does not have the right to commence arbitration on the grounds that, although Plaintiff provided a copy of the DRA bearing *Twitter's* signature, he did not submit a copy that bore *his own* signature.

30.   Defendants' actions are in breach of their explicit obligation to arbitrate under the DRA.

31.   Defendants' actions are in breach of the implied duty of good faith that is an implicit term of the DRA.

32.   Defendants having thus breached the DRA and, therefore, waived their right to arbitrate, Plaintiff has chosen to bring his dispute to Court.

## III.   PARTIES

33.   Plaintiff Woodfield is a former Twitter employee residing in Washington. While employed at Twitter, Plaintiff worked at Twitter's Seattle office.

34.   Defendant Twitter was a Delaware corporation with a principal place of business located at 1355 Market Street, San Francisco, California 94103. Upon information and belief, Twitter has since merged into Respondent X Corp., a Nevada corporation, with X Corp. as the surviving entity.

35.   Defendant X Holdings I was a Delaware corporation. Upon information and belief, X Holdings I has since merged into X Holding Corp., a Nevada corporation, with X Corp. as the surviving entity.

36.   Defendant Musk is a natural person and, on information and belief, a resident of Boca Chica, Texas.

IV.                    **FACTUAL BACKGROUND**

**A. Plaintiff Was a Dedicated Twitter Employee**

37.    Plaintiff was employed by Twitter as a Senior Staff Network Engineer.

38.    Plaintiff worked for Twitter from April 2011 through November 2016, then left and returned in 2020.

39.    For his most recent stint at Twitter, Plaintiff accepted his position with Twitter on or about April 13, 2020, began work on or about May 18, 2020, and remained continuously employed by Twitter until he was laid-off on January 4, 2023.

40.    Twitter made several promises to Plaintiff during the course of his employment, beginning with the salary and benefits promised in the initial offer of employment ("Offer Letter").

41.    Other promises were made more recently, including promises that, Plaintiff would maintain at least the same base salary and wage rate, that his employee benefits would remain "substantially comparable in the aggregate," and that in the event of layoffs, Twitter would continue to provide him with a severance package that was at least as favorable as those it had long offered.

42.    These promises were, in the period immediately surrounding Elon Musk's takeover of Twitter, broken.

**B. Elon Musk Offers and Agrees to Buy Twitter, Attempts to Renege on the Deal, and is Forced to Comply with the Terms of the Agreement He Voluntarily Entered**

43.    Twitter is a popular social media company, both in the United States and around the world. As of October 25, 2022, Twitter had over 350 million global users.

44.    Like most large social media companies, Twitter was not without its controversies. This is particularly true in the challenging and contentious area of content regulation, which is an ongoing challenge for all large platforms.

7

45.   Some of Twitter's content moderation decisions, such as the decision to suspend former-President Trump in the wake of the January 6, 2021 Capitol riot, were poorly received by certain segments of the population. These critiques grew in vehemence over the following year.

46.   During that period, Musk emerged as a particularly vociferous critic of Twitter's content moderation decisions. His criticisms, which were often expressed on Twitter, grew stronger and more hostile to the company's policies over time.

47.   He expressed the view that Twitter needed to be 'fixed' and that he could accomplish this – and would be better at doing so than anyone who was then at Twitter.

48.   On April 4, 2022, Musk disclosed that he had acquired approximately 9.2% of Twitter's stock.

49.   Following the disclosure, Musk was offered, but declined, a position on Twitter's Board of Directors.

50.   Shortly thereafter, with the encouragement of Twitter founder Jack Dorsey, Musk announced that he would purchase Twitter.

51.   He tendered an offer to purchase the outstanding shares for $54.20 each and take the company private.

52.   After some back and forth, the offer was ultimately accepted by Twitter on April 25, 2022, when Twitter and Musk entered into the Merger Agreement, which set out the terms and conditions of the acquisition.

53.   Musk's efforts to breach the Merger Agreement began barely more than two weeks later.

54.   On May 12, 2022, Musk tweeted that the Twitter deal was "temporarily on hold," despite the lack of any provision in the Merger Agreement that would allow either party to pause the deal.

55.   On July 8, 2022, Musk sent a letter to Twitter purporting to terminate the Merger Agreement.

56.     On July 12, 2022, Twitter brought an action in the Delaware Court of Chancery seeking specific performance of the Merger Agreement.

57.     After substantial public litigation, considerable bad publicity, and on the eve of his scheduled deposition in that action, on October 4, 2022 Musk announced that he would proceed with the purchase as he had initially promised.

58.     On October 26, Musk walked into Twitter headquarters in San Francisco carrying a porcelain plumbing fixture and took the self-created title "Chief Twit."

59.     The deal closed on October 27.

## C. Twitter's Employees Are Worried About the Pending Musk Takeover, and Twitter Makes Representations to Address Their Concerns.

60.     With Twitter being acquired by one of its fiercest critics, many Tweeps were understandably very concerned about their future, particularly about the potential effects of the merger on their jobs.

61.     Layoffs had already been discussed as a possibility prior to the acquisition, and it was widely reported that cuts would be needed as a consequence of the additional debt that Twitter was incurring as part of the acquisition.

62.     It was also viewed as likely that Musk would seek to make changes at Twitter, and that these could well include changes in personnel.

63.     These concerns were widespread amongst the Tweeps, and questions were asked specifically about these possibilities across a range of internal communications channels as soon as it was clear that a Musk takeover was a serious possibility.

64.     Twitter took these concerns very seriously.

65.     If a significant number of Tweeps were worried enough about their future to seek new employment and resign, it would harm Twitter's ability to continue to function smoothly while the deal was in progress.

66. The departure of a significant number of employees could, particularly if operations were adversely affected, create a material adverse event that would jeopardize the acquisition.

67. Twitter therefore took several steps to reassure its employees.

68. First, Twitter had negotiated for provisions in the Merger Agreement specifically to protect and benefit its employees by ensuring that compensation and benefits – including severance – would remain stable after the merger.

69. The final Merger Agreement included a provision – Section 6.9(a) – that obligated Twitter to maintain its pre-merger benefits, including severance, for at least a one-year period after the acquisition closed (the "Severance Stability Promise").

70. That clause read as follows, in full:

(a) <u>Continuing Employee Benefits</u>. Employees of the Company or its Subsidiaries immediately prior to the Effective Time [the close of the merger] who remain employees of Parent [X Holdings I], the Surviving Corporation [Twitter] or any of their Affiliates following the Effective Time are hereinafter referred to as the "**Continuing Employees**." For the period commencing at the Effective Time and ending on the one-year anniversary of the Effective Time (the "**Continuation Period**"), Parent shall, or shall cause the Surviving Corporation or any of their Affiliates to, provide for each Continuing Employee (i) at least the same base salary and wage rate, (ii) short- and long-term target incentive compensation opportunities that are no less favorable in the aggregate than those provided to each such Continuing Employee immediately prior to the Effective Time (provided that Parent shall not be obligated to provide such incentives in the form of equity or equity-based awards) and (iii) employee benefits (excluding equity and equity-based awards) which are substantially comparable in the aggregate (including with respect to the proportion of employee cost) to those provided to such Continuing Employee immediately prior to the Effective Time. Without limiting the generality of the foregoing, *during the Continuation Period, Parent shall*

10

> *provide, or shall cause the Surviving Corporation or any of their Affiliates to provide severance payments and benefits to each Continuing Employee whose employment is terminated during such period that are no less favorable than those applicable to the Continuing Employee immediately prior to the Effective Time under the Company Benefit Plans.*

(emphasis added).

71. And the Merger Agreement expressly defined "Company Benefit Plans" as including any "severance, termination, retention, … or other employee benefit plans … benefit policies or benefit arrangements (whether or not in writing)" that Twitter maintained.

72. Only the employees who received the benefit of the Severance Stability Promise could ever enforce that provision of the Merger Agreement; once the merger was completed, Twitter would be wholly owned and controlled by X Holdings I, and therefore neither Twitter nor X Holdings I would sue over any breach of the Severance Stability Promise.

73. On information and belief, both Musk and Twitter intended to confer the benefit of the Severance Stability Promise on Twitter's existing employees as an inducement for those employees to remain at Twitter pending the merger.

74. Moreover, the Severance Stability Promise provided benefits to all involved.

75. Twitter employees who decided not to exercise their right to seek new employment and instead remain with Twitter following a Musk acquisition received a guarantee of a degree of stability in both their compensation and in their severance packages, should Musk implement layoffs or attempt to manufacture a firing for cause.

76. Twitter also benefitted from a degree of stability via employee retention during the pendency of the acquisition and the related litigation. That reduced the chances of an acquisition-threatening material adverse event, protecting the chances that the deal would be consummated.

77.   And Musk, in extending an offer intended to entice employees to stay pending his acquisition, also received stability – the promise of a company that would be, when he completed his takeover, in largely the condition it was when he made the offer, allowing him to begin to reshape Twitter from a stable foundation.

78.   Nevertheless, Tweeps remained concerned about the consequences of the acquisition.

79.   Twitter issued the Acquisition FAQ to provide employees with a resource for information regarding the deal.

80.   The Acquisition FAQ included detailed reassurances and representations to employees regarding their compensation, and how equity grants would be handled.

81.   It also explicitly stated that, "in the event of a layoff, any employee whose job is impacted would be eligible for severance."

82.   After Musk's purchase of Twitter was announced, Twitter also held meetings with its employees to address their questions and concerns about the change in control.

83.   Some employees took the opportunity presented by at least one such meeting, an all-hands that took place on or about April 29, 2022, to specifically ask about severance.

84.   In response to those questions, Twitter orally communicated to its employees at that time that Musk had made the Severance Stability Promise in the Merger Agreement.

85.   Plaintiff in fact learned that information from Twitter.

86.   These verbal representations were, however, not enough to entirely calm employees. Tweeps continued to raise questions about their compensation, and to specifically inquire about severance.

87.   After those meetings, Twitter employees began to press Twitter to put its severance policy in writing, so that they could know exactly what they were being promised about their severance and also have the existing policy documented, so it would be more difficult for Musk to avoid were he so inclined.

88.   When those questions were not answered with sufficient clarity, they were raised again by employees in the company Slack channels during the first half of May.

89.   In response, on May 13, 2022, Twitter sent out a companywide FAQ via email ("the Severance Policy Email") that included Twitter's "general severance package if a position is eliminated."

90.   On information and belief, Twitter circulated the Severance Policy Email specifically because it wanted its employees to rely on the promise that they would be paid such severance if they were later laid off and therefore decide to take the risk of remaining at Twitter through the merger, despite Musk's evident dissatisfaction with Twitter as a company and Musk's erratic personality.

91.   The email represented that:

- Generally speaking, in the event of a position elimination, our current severance package includes a lump sum cash amount in exchange for signing a separation agreement; the package would include at least:

    o   Two months base salary or On Target Earnings for employees on the Sales Incentive Plan

    o   Pro-rated Performance Bonus Plan compensation at target

    o   Cash value of equity that would have vested within three months from the separation date

    o   A cash contribution for health care continuation.

(bullet points in original).

92.   The Severance Policy Email and Severance Stability Promise were subjects of much discussion among Twitter employees.

93.   Twitter continued to keep its employees up to date on the progress of the acquisition and related litigation.

94. On October 24, 2022 – just two days before the deal closed -- Twitter again repeated the same statement to employees regarding severance.

95. On information and belief, Twitter made these statements to reassure employees and to induce them to remain at Twitter in order to provide a stable set of conditions going into the acquisition.

96. On information and belief, Twitter expected that employees would rely upon these statements as a reason to remain at Twitter, and to refrain from seeking new employment during the pre-acquisition period.

97. It was reasonable for employees to rely upon these explicit representations. The Merger Agreement contained explicit provisions relating to severance. Twitter's additional representations outlined what that severance would consist of, and were made in response to questions that explicitly asked what the existing severance package consisted of.

98. Plaintiff did, in fact, rely upon these representations.

99. The promised severance in fact factored into Plaintiff's decision to remain at Twitter through the closing of the merger.

100. To put it simply, Plaintiff was aware that he had a safety net if Musk came in and did a mass layoff or even targeted firings: if terminated, he would receive a significant sum as a severance payment, which would help provide him time to find a new job without severe economic pressure.

101. Indeed, Plaintiff turned down an offer of other employment in the summer of 2022. Had he known that Twitter and Musk would break their promise of severance, he would not have remained at Twitter.

**D. Musk Takes Over and Almost Immediately Breaches His Obligations Under the Merger Agreement**

102. On October 26, 2022, Musk took over as the owner of Twitter.

103.  On information and belief, Musk exercised near-total personal control over decision-making at Twitter in the immediate post-takeover period, even declaring that he would sleep in the building "until the org is fixed."

104.  On information and belief, Musk did not ever intend to carry out his part of the Merger Agreement.

105.  On information and belief, Musk signed the Merger Agreement with every intention of violating its provisions.

106.  In fact, it immediately became clear that Musk had no intention of honoring the arrangement that he had voluntarily agreed to in the Merger Agreement, and which he had reluctantly agreed to fulfill.

107.  In addition to the provisions benefitting ordinary employees, the Merger Agreement also effectively ratified "Golden Parachute" provisions for any executives Musk let go following the merger.

108.  Almost immediately upon Musk's arrival at Twitter, he instead purported to terminate executives for cause.

109.  On information and belief, this occurred in some cases within hours of the takeover.

110.  On information and belief, Musk is refusing to pay those executives the agreed-upon compensation.

111.  Very shortly thereafter, Musk began a mass layoff of thousands of Twitter employees., in violation of a promise he had made directly to them.

112.  On November 3, 2022, Twitter instructed its entire 7,500 employee workforce not to appear for work on Friday the 4th. Instead, employees would receive an email by 9:00 a.m. Pacific Time to notify them whether they were still employed.

113.  On information and belief, many employees were in effect notified of their termination earlier, when their access to Twitter systems was abruptly terminated.

114.  The next day, roughly half of Twitter's workforce, including Plaintiff, were laid off.

115.   The email informing the affected employees that they had been
       terminated outlined a planned severance package of far less than
       what Twitter had repeatedly promised – and contractually agreed –
       to pay.

116.   Specifically, the email advised the employees that "[t]he Company
       is offering a severance package of one month base pay (or OTE for
       commission-based employees) to eligible impacted employees."

117.   But the layoffs did not stop there. Over the next several days,
       Twitter fired further employees, informing them that Twitter had
       deemed them in violation of some unnamed Twitter policy.

118.   These purported "for cause" terminations were clearly pretextual,
       and constituted further layoffs.

119.   In the same time-frame, and consistent with conversations Musk
       had in advance of closing on the merger in which he discussed
       making changes to employee working conditions in order to induce
       resignations, Musk then announced that Twitter would be ending
       its remote work policy and immediately require all workers to
       report to work at a physical Twitter office.

120.   He did so despite Twitter employing workers who lived (and
       worked remotely) many hours or even hundreds of miles from the
       nearest Twitter office.

121.   Musk soon updated the policy, indicating that Twitter would
       "allow" a transition period for remote workers who lived too far
       from an office to feasibly commute to move to a location closer to
       the Twitter offices.

122.   Later, the policy morphed into one in which managers could allow
       their reports to work remotely if they chose to – but would
       themselves be fired if the employees they allowed to work from
       home did not perform up to Musk's standards.

123.   As intended, this change to Tweeps' conditions of employment
       triggered a wave of resignations.

124.   But that wasn't enough. In mid-November, Musk sent another
       email, with a link to an online form and an ultimatum: Any Twitter

employee who wanted to keep their job at Twitter would need to affirmatively indicate their consent, by checking a box on an online form, to a more "hardcore" working environment which would "mean long hours at high intensity" – and, in a transparent attempt to avoid the severance obligation to which he had bound himself, Musk unilaterally decreed that employees who did not affirmatively check the box deemed to have "voluntarily resigned" in exchange for two-months of non-working leave and a single month's post-separation pay.

125.    As part of this wave of layoffs, a substantial number of employees were laid off because they did not immediately affirmatively agree to the material changes to their working conditions that Musk had unilaterally demanded.

126.    And yet again, that still wasn't enough.

127.    After the November 17 layoff, Musk brought in engineers from his other companies – including Tesla, Inc. ("Tesla") and the Space Exploration Technologies Corporation ("SpaceX") – among others, to conduct "code reviews" of code written by Twitter employees.

128.    The "code reviews" were a clear pretext to attempt additional "for cause" firings; the "reviewers" lacked the context to meaningfully evaluate the code, and the reviews were completed in an amount of time that was clearly insufficient for any good faith approach to the task.

129.    After the "code reviews," Twitter fired multiple employees on the pretext that their work was not up to standard. Many of those employees had received uniformly positive performance reviews prior to being fired.

130.    Other employees were put on PIPs – Performance Improvement Plans – in a transparent attempt to lay the groundwork for future for-cause firings.

131.    The slapdash, bad-faith nature of these "reviews" was open and obvious. Some managers acknowledged that they were instructed to "stack rank" their employees, so that at least some employees in each group would be fired or placed on PIPs even if all were

17

performing adequately. Other managers specifically informed employees they had placed on PIPs that the employees should "keep doing what they were doing" because their performance was adequate. Other managers could not identify the standard by which they had assessed particular performance as requiring improvement. And at least some fired employees were informed that they had been fired by mistake and asked to return to work.

132. All told, on information and belief, Twitter laid off, fired, or engineered the resignations of over 5,000 employees within less than two months.

133. The reason Twitter sought to engineer resignations or excuses for for-cause firings is clear: were Twitter required to keep its word to all of the laid-off employees and actually pay them severance per the pre-existing policy, the total cost would easily be in the nine figures.

134. Instead, Twitter has simply refused to pay the severance it advertised to the employees to convince them to stay through the merger, and which Musk bound himself to pay them.

135. On information and belief, Musk routinely violates agreements as a that would require him to expend money matter of policy in an apparent belief that his immense wealth and audacity will shield him from any negative consequences of his actions.

136. In so doing, along with its other cost-cutting measures (such as refusing to pay employee benefits or its vendors) Twitter violated not only its word but a raft of state and federal statutes in jurisdictions across the country.

**E. Twitter's Pattern of Delay**

137. Plaintiff, of course, is not alone in his efforts to hold Defendants responsible for their disregard of their contractual obligations.

138. As of the filing of this Complaint, Plaintiff's former colleagues have brought more than two thousand demands for arbitration, beginning in December 2022.

139. However, on information and belief, fewer than three hundred of these arbitrations have been commenced.

140. The rest of these demands have languished in a dispute resolution no-man's-land, unable to move forward in a speedy and efficient manner due to Defendants' persistent and intentional efforts to delay the proceedings at every stage.

141. These efforts begin as soon as demands are filed.

142.  Although the DRA requires the parties to arbitrate "according to the then-current JAMS rules," which state that the case-initiation fees are due upon receipt of the JAMS-issued invoice, Defendants delay payment of those fees for weeks or months.

143. As a result, rather than moving efficiently into arbitration, claimants are forced to cool their heels before their case can even commence.

144. Defendants do not only delay the payment of the case initiation fees, however. They also delay the payment of incremental deposits required throughout the arbitration, again by a period of several weeks, meaning that the arbitration process grinds to a halt every time these fees are assessed.

145. This is, of course, presuming that Defendants even consent to JAMS' jurisdiction in the first place.

146. Defendants are aware – and, indeed, have affirmatively represented to the Court – that every employee hired since at least March 2013 has signed a DRA as a condition of their employment with Twitter.

147. In fact, Twitter's policy of requiring employees to sign a DRA upon hire dates back to at least March 2013.

148. Defendants are aware, and have affirmatively represented to the Court, that Twitter maintains copies of fully executed DRAs within its files.

149. Defendants have relied on the existence of these DRAs to compel its former employees into arbitration rather than litigating its claims in open court.

150. Yet, when it comes time to actually proceed into arbitration, Defendants' willingness to rely on the DRAs in their possession evaporates.

151. For example, every employee hired since June of 2018 has signed a DRA that specifies JAMS as the arbitration provider. Nonetheless, Defendants will not stipulate to JAMS's jurisdiction over these arbitration demands unless Tweeps provide *their* copy of the DRA.

152. Furthermore, Tweeps' attempts to recover their DRAs from Twitter result in a wild goose chase out of a Benny Hill episode.

153. Twitter provided an email address (peoplequestions@twitter.com, or "PeopleQuestions") for employees to contact the company, but it is not a reliable way to get information.

154. Messages sent to PeopleQuestions go unanswered more often than not, even when questions are urgent.

155. Indeed, when Tweeps email PeopleQuestions with a request for their DRA, they get – at best – a seemingly-automated reply that advises further response in 3-5 business days.

156. That response typically never comes.

157. But incredibly, Defendants' bad faith delay extends even farther.

158. Plaintiff **had** a copy of his DRA – the pre-execution version, signed by Twitter, that had been included in his offer letter.

159. The post-execution version, signed by both Twitter and Plaintiff, was safely tucked away by Twitter in its files.

160. Plaintiff knows he signed his DRA, and affirmatively pleaded that fact in his demand for arbitration.

161. Twitter knows Plaintiff signed his DRA; after all, it represented to the Northern District of California that he would not have been able to start his job otherwise and that it maintained files on all DRAs signed since at least September 2017, prior to Plaintiff's hire.

162.   Plaintiff knows Twitter knows Plaintiff signed his DRA.

163.   In fact, Twitter knows Plaintiff knows Twitter knows Plaintiff signed his DRA.

164.   But despite the fact that everyone knows that there is a valid DRA between the parties, Defendants did not move forward in a manner consistent with their agreement to arbitrate.

165.   Rather, they requested that JAMS deny jurisdiction – an action clearly and unmistakably inconsistent with their agreement to arbitrate – in an attempt to introduce one more period of delay.

166.   Moreover, though the DRA provides for arbitration with JAMS and pursuant to JAMS' Rules – which require Defendants to pay the costs of the arbitration without allocating fees to Plaintiff – and though the DRA contains no contrary agreement by Plaintiff to share fees, Defendants recently informed JAMS that they would not proceed with *any* arbitration in which JAMS required Twitter to bear the arbitration fees unless applicable state law *also* required them to do so.

167.   To that end, Defendants expressly demanded that JAMS close and refuse to administer any arbitrations filed with JAMS by Claimants located in Washington state, among others.

168.   Defendants have thus *also* repudiated their obligation to arbitrate with Plaintiff at JAMS.

169.   Plaintiff has had enough. He accepts Defendants' waiver of their right to arbitrate his dispute, and accordingly brings this action in court.

## V.   VEIL PIERCING ALLEGATIONS

170.   There is such a unity of interest and ownership between Twitter and Musk that Twitter's separate corporate status no longer exists.

171.   Musk, through X Holdings I, owns more than 50% of Twitter.

172.   Musk dominates Twitter's decision-making and operations.

173. For instance, Musk changes Twitter's policy by conducting polls from his Twitter account.

174. Prior to Musk's takeover of Twitter, for example, Twitter had banned the accounts of neo-Nazis such as Andrew Anglin.

175. Following Musk's takeover, he conducted a Twitter poll to determine whether to restore previously banned accounts.

176. At Musk's direction, Twitter restored Anglin's account.

177. Twitter has engaged in other content moderation decisions at Musk's whims.

178. For instance, Musk initially indicated that after his takeover of Twitter, the @ElonJet account that used publicly available ADS-B data to provide information on Musk's private jet flights, would be allowed to remain on Twitter.

179. After a crazed fan of Musk's ex-girlfriend, Grimes, confronted a car carrying their son, X Æ A-Xii, Musk blamed the @ElonJet account and directed its suspension from Twitter.

180. Similarly, Musk unilaterally changed the price of Twitter's new subscription service, Twitter Blue, based on a tweet interaction with author Stephen King.

181. On information and belief, Musk has exercised control over Twitter's decision-making and operations in other ways, from directing it not to pay landlords and vendors to repudiating its severance obligations.

182. On information and belief, Musk has commingled his other assets with Twitter's, bringing engineers and executives from his other companies – such as Tesla, SpaceX, and The Boring Company – to provide services for Twitter.

183. On information and belief, those engineers and executives have not been separately hired, retained, or paid by Twitter for any services they have provided to Musk at Twitter.

184. Moreover, Musk has repeatedly publicly asserted that Twitter is on the edge of insolvency and may declare bankruptcy.

22

185. On information and belief, any such bankruptcy would be the result of the debt Twitter incurred as part of financing Musk's purchase of Twitter in the first instance.

186. On information and belief, Twitter is undercapitalized specifically as a result of Musk's purchase of the corporation.

187. Under the circumstances, and particularly given the risk of bankruptcy and insolvency, an inequitable result is likely to follow if Twitter's actions are considered those of the corporation alone.

188. As such, Musk should be personally liable for any amounts awarded on the claims alleged herein.

## VI.   CLASS ACTION ALLEGATIONS

189. Plaintiff brings these causes of action on behalf of himself and on behalf of the following proposed class ("Class"):

> All Twitter employees who were laid off on or around November 4, 2022 through October 31, 2023.

190. With respect to Cause of Action 1: Breach of the DRA, Plaintiff brings this action only on behalf of the proposed subclass ("DRA Subclass"):

> All Twitter employees who were laid off on or around November 4, 2022 through October 31, 2023 with whom Twitter has a DRA Defendants have indicated they will breach, *inter alia*, deliberately delaying the arbitrations and refusing to pay arbitral fees as required by the DRA and the rules of JAMS and the American Arbitration Association.

191. This action is appropriately suited for a class action because:

192. Numerosity and Ascertainability.  Upon information and belief, the proposed Class and Subclasses include over forty former Twitter employees, and therefore joinder of all individual Class members would be impractical.

193. Predominant Common Questions of Law and Fact.  Common questions of law and fact affecting the rights of all Class members predominate over individualized issues.  Defendants' liability is

23

based on their decision to not pay laid-off employees the previously promised severance package, which it represented would include at least two months of base salary or On Target Earnings for employees on the Sales Incentive Plan; pro-rated Performance Bonus Plan compensation at target; cash value of equity that would have vested within three months from the separation date; and cash contribution for health care continuation. Common questions include, but are not limited to:

194. Whether Defendants breached the DRA by, among other things, failing to advance, and refusing to pay, contractually agreed upon arbitration fees and costs for all DRA Subclass members;

195. Whether Defendants breached the Merger Agreement by refusing to pay the Severance Benefits outlined therein;

196. Whether Defendants breached their oral contract by refusing to pay the Severance Benefits outlined in the Merger Agreement;

197. Whether Defendants breached Class members' offer letters by refusing to pay Severance Benefits in accordance with the terms of their Offer Letters which required them to pay all benefits of employment;

198. Whether Defendants Musk, X Holdings I, or X Holdings II committed fraud by entering into the Merger Agreement with the intent to break the Severance Stability Promise;

199. Whether Defendants violated WARN by failing to provide the Class members all benefits of employment for the required ninety-day notice period;

200. Whether there is a unity of interest and ownership between Defendant Twitter and Musk such that Defendant Musk may be found personally liable for the Causes of Action hereinafter alleged;

201. The proper measure of damages sustained by members of the Class; and

202.    Whether Defendants' affirmative defenses, if any, raise any additional common issues of law or fact as to Plaintiff and the Class members.

203.    <u>Typicality.</u>  Plaintiff's claims are typical of the claims of the Class as a whole because Plaintiff and the Class were subject to Defendants' universal decision to fail or refuse to provide the contracted-for and promised severance pay in violation of the law. Plaintiff's claims are typical of the DRA Subclass because Plaintiff and the DRA Subclass were subject to Defendants' universal decision to comply with their obligation to comply with arbitrator-specific rules in accordance with DRA.

204.    <u>Adequacy of Representation</u>.  Plaintiff will fairly and adequately represent the interests of the Class because his individual interests are consistent with, and not antagonistic to, the interests of the Class. Plaintiff has retained counsel who have the requisite resources and ability to prosecute this case as a class action. Counsel for Plaintiff are experienced attorneys who have successfully litigated other cases involving similar issues, including breach of contract and fraud.

205.    This suit is properly maintained as a class action under Fed. R. Civ. P. 23 because Defendant failed or refused to pay promised severance when it terminated Plaintiff and the Class members. Class treatment is superior to alternative methods to adjudicate this dispute because Plaintiff and the similarly situated laid-off employees suffered similar treatment and harm as a result of a universal decision made by Twitter to fail or refuse to pay promised severance payments at the time of termination.  This suit is also properly maintained as a class action because the common questions of law and fact predominate over any questions affecting only individual members of the Class.  For these and other reasons, a class action is superior to other available methods for the fair and efficient adjudication of the controversy set forth herein.  Class certification is also superior because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' practices.

## VII.  CAUSES OF ACTION

### A.  Count One (against Twitter and X Holdings I): Breach of Contract (DRA) (Brought by Plaintiff on Behalf of Himself and the DRA Subclass)

206.  Plaintiff restates and realleges each paragraph above as if fully stated herein.

207.  Plaintiff and the DRA Subclass each executed DRAs with Twitter, which detailed the procedure by which any dispute with Twitter would be resolved.

208.  The DRAs executed by Plaintiff and the DRA Subclass members are substantially similar and contain the following relevant provisions or similar language that contained with Plaintiff's DRA:

209.  The DRAs state that they apply, "without limitation, to disputes regarding the employment relationship, terms and conditions of employment, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, harassment, or retaliation, and claims arising under the Uniform Trade Secrets Act, Title VII of the Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act (except for claims for employee benefits under any benefit plan sponsored by the Company and covered by the Employee Retirement Income Security Act of 1974 or funded by insurance), Genetic Information Non-Discrimination Act, and state statutes, if any, addressing the same or similar subject matters, all other state statutory and common law claims, and any other employment-related claim."

210.  The DRAs also state that "[t]his Agreement requires all covered disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial."

211.  The DRAs also provide that all claims will be brought before JAMS, "pursuant to the then-current JAMS Rules."

212.  The JAMS Employment Arbitration Rules state, in relevant part, that JAMS will commence arbitration based upon the existence of

> "[a] pre-dispute written contractual provision requiring the Parties to arbitrate the employment dispute or claim and specifying JAMS administration or use of any JAMS Rules or that the Parties agree shall be administered by JAMS."

213. The DRAs are pre-dispute written contracts requiring the parties to arbitrate all employment disputes or claims.

214. The post-June 2018 DRAs specify JAMS administration and the use of the JAMS rules.

215. Plaintiff fulfilled all of the required conditions for JAMS to assert jurisdiction over Plaintiff's dispute with Twitter and commence arbitration were met by the copy of Plaintiff's DRA he submitted to JAMS, even in the absence of his signature.

216. Even were they not, Twitter was obligated by the DRA to consent to arbitration at JAMS, whether by providing its copy of the DRA from its files or by simply paying the case initiation fee and answering Plaintiff's arbitration demand without objecting to jurisdiction. Twitter breached the DRAs by asking JAMS to decline jurisdiction over Plaintiff's dispute after he fulfilled the conditions for commencement.

217. Twitter's objection to JAMS' jurisdiction was fundamentally inconsistent with its agreement to arbitrate at JAMS.

218. Additionally, because Twitter required its employees to execute the DRAs as a condition of employment, JAMS' rules require Twitter to pay 100% of the arbitration fees for arbitrations filed by its employees.

219. Twitter agreed in the DRA to abide by JAMS' rules.

220. Nevertheless, Twitter has informed JAMS that it will not pay the required fees for employees located in states other than California, and demanded that JAMS terminate the arbitrations filed by employees from such states.

221. As part of that demand, Defendants made clear that they would not arbitrate with any employee who was unwilling to voluntarily contribute 50% of the arbitration fees.

222. In so doing, Twitter breached its DRA with each employee who already filed for arbitration with JAMS.

223. And by announcing that as a policy matter Defendants will not arbitrate with its employees, Defendants anticipatorily breached each DRA providing for arbitration at JAMS.

224. Defendants similarly anticipatorily breached each pre-June 2018 DRA.

225. Twitter's pre-June 2018 DRAs did not identify a particular arbitration provider before whom claims could be commenced.

226. On April 27, 2023, Defendants agreed that former Twitter employees who executed pre-June 2018 DRAs and were clients of undersigned counsel could bring their claims with the American Arbitration Association ("AAA").

227. Like JAMS, AAA rules require Defendants to pay for 100% of the costs of any such arbitration.

228. As such, Defendants' refusal to arbitrate unless Claimants pay 50% of the arbitral fees is also an anticipatory breach of the pre-June 2018 DRAs.

229. As such, Plaintiff and the DRA Subclass members are entitled to a declaration that Twitter has waived its right to arbitrate disputes with Plaintiff and the DRA Subclass members, that Twitter cannot enforce the DRA terms, including the class action waiver contained therein, and damages in an amount to be proven at trial.

**B. Count Two (against Twitter and X Holdings I): Breach of Merger Agreement (Brought by Plaintiff on Behalf of Himself and the Class)**

230. Plaintiff restates and realleges each paragraph above as if fully stated herein.

231.   Plaintiff and the Class members are intended third-party beneficiaries[2] of the Severance Stability Promise, and therefore can bring this claim to enforce that promise.

232.   Twitter has breached the Merger Agreement by refusing to pay Plaintiff and the Class members the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

233.   X Holdings I has breached the Merger Agreement by failing to require Twitter to pay Plaintiff and the Class members the severance outlined in the Severance Package, as well as other benefits that were required to remain unchanged.

234.   As such, Plaintiff and the Class members are entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## C. Count Three: (against Twitter) Breach of Oral Contract (Brought by Plaintiff on Behalf of Himself and the Class)

235.   Plaintiff restates and realleges each paragraph above as if fully stated herein.

236.   The Severance Policy Email and related communications constituted an offer from Twitter to its employees, that Twitter would provide the specified severance and maintain current

---

[2] Section 6.9(e) of the Merger Agreement provides that Section 6.9(a) does not give employees "any third-party beneficiary or other rights." But the Merger Agreement is governed by Delaware law, and Delaware law does not treat such recitals as dispositive; rather, it applies Delaware's traditional tests for determining whether a non-party to the contract can enforce it as a third-party beneficiary notwithstanding such a clause, and in this circumstance application of those tests confirms that Plaintiff *is* a third-party beneficiary with standing to enforce. An arbitration demand is, of course, not the place for legal argument on this issue, which Plaintiff will provide in briefing if and as necessary. Plaintiff raises the issue here as part of his duty of candor, to avoid the implication that the Merger Agreement lacks such a clause.

benefits in exchange for each employee's remaining employed at Twitter through the merger.

237. Plaintiff and the Class members accepted that offer by continuing to work at Twitter instead of seeking alternative employment.

238. Plaintiff and the Class members provided Twitter with consideration for its promise by continuing to work at Twitter through that period until they were laid off.

239. As such, Twitter entered into a binding agreement to maintain the then-current benefits and provide Plaintiff and the Class members with the severance outlined in the Severance Policy Email, which they fully performed.

240. Twitter has breached this agreement by refusing to pay Plaintiff and the Class members the severance outlined in the Severance Policy Email and diminishing the benefits it made available to them.

241. As such, Plaintiff and the Class members are entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

**D. Count Four (in the alternative, against Twitter): Promissory Estoppel (Brought by Plaintiff on Behalf of Himself and the Class)**

242. Plaintiff restates and realleges each paragraph above as if fully stated herein.

243. To the extent that Twitter's communications and Plaintiff's subsequent conduct did not create an enforceable contract with Plaintiff and the Class members, Twitter's representations to the employees about severance are enforceable under the doctrine of promissory estoppel.

244. The Severance Stability Promise is a clear and explicit promise that Twitter employees would receive severance and other benefits no less favorable after the merger than they would have received under the old management.

245.   Twitter reinforced and repeated this promise both orally and in the Severance Policy Email and Acquisition FAQ.

246.   It was reasonable for Plaintiff and the members of the Class to rely upon that promise.

247.   Plaintiff and the Class members did in fact rely upon that promise.

248.   Plaintiff and the Class members were damaged by that reasonable reliance, in that it negatively impacted their ability to find alternative employment in advance of the merger.

249.   Twitter's promise to provide Plaintiff and the Class members with severance and other benefits in accordance with the policy outlined in the Severance Policy Email and Acquisition FAQ is therefore binding, and Twitter must provide Plaintiff with such severance.

250.   As such, Plaintiff and the Class members are entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## E. Count Five (against Twitter): Breach of Offer Letter (Brought by Plaintiff on Behalf of Himself and the Class)

251.   Plaintiff restates and realleges each paragraph above as if fully stated herein.

252.   Plaintiff and the Class members each executed offer letters with Twitter, which detailed the terms of their employment (the "Offer Letters").

253.   The Offer Letters constitute binding contracts between Twitter and Plaintiff and the members of the Class.

254.   The Offer Letters provide that Plaintiff and the Class members will be eligible to receive benefits under the terms of Twitter's benefits plans.

255.   Twitter's severance policy as set out in the Severance Policy Email constitutes a benefit plan that Plaintiff and the Class members were entitled to receive the benefit of when Twitter terminated Plaintiff and the Class members.

256.  Indeed, on information and belief, the severance policy as set out in the Severance Policy Email was documented in other ways, including in a severance "Matrix" reflecting Twitter's actual severance policy.

257.  Twitter did not provide Plaintiff and the Class members with severance in accordance with its benefit plan.

258.  As such, Twitter breached the Offer Letters, and Plaintiff and the Class members are entitled to an award of damages in an amount to be calculated at hearing, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

## F. Count Six (against all Respondents): Fraud (Brought by Plaintiff on Behalf of Himself and the Class)

259.  Plaintiff restates and realleges each paragraph above as if fully stated herein.

260.  In signing the Merger Agreement, and in its subsequent statements to its employees, Twitter represented that if it laid off employees in the first year following the merger, it would pay severance no less favorable than it had paid previously.

261.  Twitter intended that its employees would rely upon these representations and elect to remain at Twitter through the merger period.

262.  In addition, on information and belief, Musk, X Holdings I, and X Holdings II intended Twitter to communicate their purported agreement to the Severance Stability Promise to the Tweeps in order to allay Tweep concerns about the merger.

263.  On information and belief, Musk personally approved many of Twitter's communications with its employees regarding the Merger Agreement and the protections it offered the employees.

264.  Twitter has now affirmatively argued to this Court that the Merger Agreement was never intended to provide the employees with the protection Twitter represented to the employees were contained in the Merger Agreement.

265.   Upon information and belief, Musk and X Holdings I each ratified and approved that argument.

266.   Upon information and belief, Musk and X Holdings I never intended for the Merger Agreement to provide Twitter's employees with the protections Twitter represented to the employees were contained in the Merger Agreement.

267.   Upon information and belief, at the time he approved Twitter's communications to employees, Musk did not believe that the Merger Agreement offered employees the protection of their severance that those communications described to them.

268.   On information and belief, Musk, X Holdings I, and X Holdings II intended that Twitter's employees would rely upon these representations and elect to remain at Twitter through the merger period.

269.   Plaintiff and the Class members relied upon these representations.

270.   On information and belief, none of Musk, X Holdings I, or X Holdings II ever intended to follow through on the Severance Stability Promise.

271.   Indeed, upon arrival at Twitter, Musk's people communicated to at least some Twitter employees that Musk's general approach to business is to operate on a "zero-cost basis" that requires all costs to be justified afresh, and that Musk treats any preexisting legal obligations as completely irrelevant to whether he will in fact pay such costs.

272.   On information and belief, Twitter either knew or was reckless to the fact that its representations were untrue.

273.   When it laid off Plaintiff and members of the Class, Twitter in fact offered severance that was far less favorable than it had previously paid to laid-off employees.

274.   As a result of Respondents' fraud, Plaintiff and members of the Class suffered damages.

275. As such, Plaintiff and the Class members are entitled to an award of damages in an amount to be calculated at hearing, but which are reasonably believed to exceed $500,000,000.00, plus pre- and post-judgment interest, costs, attorneys' fees, and penalties as authorized by statute.

276. In addition, Plaintiff and the Class members are entitled to an award of punitive damages.

## G. Count Seven: WARN Act Violations (29 U.S.C.A. § 2101 et seq.) (Brought by Plaintiff on Behalf of Himself and the Class)

277. Plaintiff restates and realleges each paragraph above as if fully stated herein.

278. The Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2100 et seq., ("WARN Act"), requires that employers provide 60-day notice of any mass layoff.

279. On information and belief, Twitter's layoffs meet all statutory requirements for a mass layoff under the WARN Act.

280. In an apparent attempt to comply with the WARN Act, Twitter did not immediately terminate the laid-off employees, including Plaintiff and the Class members.

281. Instead, Twitter designated a period of 60 or 90 days as a period during which Plaintiff and the Class members would remain employed but in a 'nonworking' status.

282. However, Twitter has failed to continue to provide the laid-off employees (including Plaintiff and the Class members) with their full benefits provided to other employees during this period and is thus in violation of the WARN Act.

283. For instance, Twitter provided its employees with an annual wellness benefit of $1,100, which refreshed each January.

284. Twitter also provided other "annually refreshing" benefits to its employees.

285. Yet while Twitter is continuing to provide those and other benefits to its ongoing employees, it denied them to laid-off employees,

including Plaintiff and the Class members, despite those employees continuing to be employed by Twitter on January 1, 2023.

286. Twitter informed laid-off employees who inquired about those benefits that "[e]xpenses related to productivity, wellness, phone, or wifi expenses and learning allowance reimbursement during the Non-Working Notice period window are not permitted."

287. As a result of Twitter's violation of the WARN Act, Plaintiff and the Class members are entitled to damages to be proven at hearing, including Plaintiff's and the Class member's benefits for the "Non-Working Notice period window" to which Plaintiff and the Class members were entitled, statutory WARN Act penalties, and pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

## H. Count Eight: Employment Discrimination (42 U.S.C § 2000e, Cal. Government Code § 12940 et seq., RCW 49.60.030 and 49.60.180(2) (Brought by Plaintiff)

288. Plaintiff restates and realleges each paragraph above as if fully stated herein.

289. Both state and federal law bar Twitter from discriminating on the basis of race, sex, gender, family status, disability, age, and other grounds.

290. For instance, Section 12940 of the California Government Code bars any California employer from engaging in employment discrimination, while 42 U.S.C. § 2000e bars employment discrimination at the federal level.

291. In addition, Washington antidiscrimination laws, including RCW 49.60.030 and 49.60.180(2), similarly prohibit discrimination in employment.

292. Despite those laws, the anecdotal evidence currently available to Plaintiff indicates that Twitter likely conducted its mass layoff on a discriminatory basis.

293. Reviewing the available information on Twitter's mass layoff and subsequent conduct, it appears that women, older employees, minorities, and employees who had taken or scheduled family leave were targeted for adverse employment action.

294. Indeed, Twitter is currently facing multiple class action suits for discrimination on the basis of disability and sex.

295. Compounding these warning signs, Twitter has refused to respond to Plaintiff's counsel's request that it voluntarily turn over demographic information on the mass layoff to allow Plaintiff to confirm or rebut the picture painted by the available anecdotal information.

296. Plaintiff is an older employee.

297. On information and belief, Plaintiff was included in the mass layoff because he is an older worker.

298. The decision of which employees to include in the mass layoff was made from Twitter's California headquarters.

299. As a result of the foregoing, Twitter has violated Federal and state antidiscrimination law, and Plaintiff is entitled to an award of compensatory and punitive damages, pre- and post-judgment interest, costs, attorneys' fees, and such other and further relief as is appropriate.

## I. Count Nine (Against Twitter, X Holdings I, and Musk): Wage Theft (Brought by Plaintiff)

300. Plaintiff restates and realleges each paragraph above as if fully stated herein.

301. Under both Washington and California law, promised severance counts as "wages" that must be provided to a terminated employee with their final paycheck.

302. Under California law, an employer that fails to provide an employee with all wages due is liable not only for the unpaid amount, but also for liquidated damages in the amount of any stolen wages.

303. Under California law, engaging in such wage theft triggers waiting time penalties in the amount of $1/365^{th}$ of the employee's compensation for the immediately prior year, which are awarded for each day of delay up to a maximum of 30 days.

304. Under both Washington and California law, Plaintiff may bring claims for wage theft against not only Twitter, but X Holdings I and Musk as an individual.

305. Twitter's choice to pay Plaintiff less than the severance guaranteed to him under the Severance Stability Promise was made willfully, with the intent to deprive Plaintiff of his rightful wages, in violation of RCW 49.52.050(2).

306. Under Washington law, Plaintiff is entitled to treble damages.

307. As such, Twitter, X Holdings I, and Musk are jointly and severally liable for Plaintiff's unpaid severance, waiting time penalties, and liquidated damages, along with pre- and post-judgment interest, costs, and attorneys' fees as authorized by statute.

## VI.   REQUEST FOR RELIEF

308. Wherefore, Plaintiff Woodfield respectfully asks this Court:

a.  For an order certifying this as a class action;

b.  For an order appointing Plaintiff as the class representative and Plaintiff's counsel as the Class and DRA Subclass counsel;

c.  For an order declaring that Defendants breached the DRA as to the DRA Subclass;

d.  For compensatory damages, including but not limited to, unpaid severance wages, plus interest, according to proof allowed by law;

e.  For liquidated damages allowed by law;

f.  For an award of pre-judgment and post-judgment interest;

g. For preliminary and permanent injunctive relief enjoying Defendant from engaging in the unlawful and unfair practices alleged herein;

h. For a reasonable service payment to the Plaintiff Woodfield for his services for the benefit of the Class and DRA Subclass;

i. For such other and further relief that the Court may deem just and proper.

Dated: July 18, 2023          Respectfully submitted,

*/s/ Joseph L. Christensen*

Joseph L. Christensen (#5146)
CHRISTENSEN & DOUGHERTY LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Tel: (302) 212-4330
joe@christensendougherty.com

Akiva Cohen (*pro hac vice forthcoming*)
Lane Haygood (*pro hac vice forthcoming*)
Dylan M. Schmeyer (*pro hac vice forthcoming*)
Michael D. Dunford (*pro hac vice forthcoming*)
KAMERMAN, UNCYK, SONIKER, & KLEIN, P.C.
1700 Broadway, 16th Floor
New York, NY 10019
Tel: (212) 400-4930
acohen@kusklaw.com
lhaygood@kusklaw.com
dschmeyer@kusklaw.com
mdunford@kusklaw.com

*Attorneys for Plaintiffs*

38