## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **CHRIS WOODFIELD, ON BEHALF OF HIMSELF AND ALL OTHERS SIMILARLY SITUATED,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**TWITTER, INC., X CORP., X HOLDINGS I, INC., X HOLDING CORP., AND ELON MUSK,**<br><br>**DEFENDANTS.** | **C.A. NO. 1:23-CV-780-CFC**<br><br>**DECLARATION OF AKIVA COHEN** |

1.      I am a Partner at Kamerman, Uncyk, Soniker & Klein, P.C., counsel to Chris Woodfield along with many other former Twitter employees, and I submit this declaration in opposition to Defendants' Motion to Compel Arbitration. I have personal knowledge of the facts set forth herein and could and would testify competently thereto if required to do so.

2.      My colleagues and I have filed more than eighty demands for arbitration on behalf of former Twitter employees under the version of Twitter's Dispute Resolution Agreement ("DRA") which provides for arbitration with JAMS subject to the JAMS Employment Rules and Procedures (the "Rules").[1] These arbitrations have been characterized by a consistent pattern of delay.

---

[1] A true and correct copy of the Rules is attached hereto as **Exhibit 1**.

### I.  Defendants Delay the Arbitration by Delaying Payment

3.     In every case, Defendants have delayed payment of the invoiced fees until roughly 30 days after the due date listed on each invoice. And by this stratagem, Defendants delay *every* arbitration by roughly two months.

4.     Before JAMS will proceed with an arbitration, it needs to receive payment on two invoices, each of which are issued as "due upon receipt." First, upon filing, JAMS issues an invoice for the case initiation fees. Only after that invoice is paid will JAMS issue a commencement letter and begin the process of arbitrator selection. Then, after the parties have selected an arbitrator, JAMS issues another invoice, this time for an initial deposit for the arbitrator's fees. Again, only after that invoice is paid in full will JAMS allow the arbitration to proceed to an initial conference followed by actual litigation.

5.     As a result, every arbitration we have filed has been delayed by at least two months – one month waiting for Twitter to pay its case initiation fees, and another waiting for Twitter to pay its initial deposits towards the arbitrator fees. Some have been delayed for far longer, because Defendants reset their internal deadline for payment every time JAMS reissues an invoice.

2

6. Defendants have acknowledged that there is no law or rule that allows them to impose these extensive delays; rather, they simply assert that delaying each arbitration for months is "reasonable."[2]

7. It is evident from the consistency of the payment delays that they are intentional and voluntary, not a result of any flaw in Defendants' payment system. Defendants have consistently declined to confirm when asked that they have ever intended to make payment any sooner than 30 days after the due date, and have previously cited a California law as the basis for that delay[3].

**II. Defendants Delay the Arbitration via Refusal to Arbitrate**

8. Defendants have not limited their delay tactics to payment of invoices. Another of Defendants' delay tactics has been refusal to arbitrate unless the claimant has a fully executed copy of their Dispute Resolution Agreement ("DRA") in hand.

9. The genesis of this tactic appears to have been another attorney's decision to file arbitration demands for several hundred claimants without making any individualized allegations that any claimant actually had an arbitration agreement with Twitter that required Twitter to arbitrate with JAMS. Instead, for each claimant, she simply filled out the JAMS-provided Demand for Arbitration

---

[2] See **Exhibit 2**, a true and correct copy of an email thread including Defendants' counsel dated June 8, 2023, annexed hereto.
[3] See **Exhibit 3**, a true and correct copy of an email thread between Defendants' counsel and another attorney filing related arbitrations and filed as D.I. 36 in *Rodriguez v. Twitter*, N.D. Cal. Case 3:22-cv-07222-JD (Feb. 8, 2023).

form reciting that the claimant brought particular claims similar in fact in law to those alleged in various class actions against Twitter (attaching to each demand the applicable class action or actions)[4] and relying on an "identical unsigned and undated template form of a Twitter arbitration agreement" for all claimants. D.I. 13-1 at 2.

10.     That was problematic, because not all Twitter employees had signed a form DRA that required arbitration at JAMS. Some employees joined Twitter before Twitter made execution of a DRA a mandatory condition of employment, which occurred in roughly 2013.[5] Even after that occurred, Twitter did not amend its DRA to require arbitration at JAMS until roughly June 2018. And aside from that, employees who joined Twitter overseas and then transferred to the US entity or who joined Twitter via merger were not necessarily required to sign a DRA before continuing their employment with Twitter, Inc. As a result, the filings relying on the unsigned template and no specific individualized allegations did not give Twitter any basis to identify which claimants actually had arbitration agreements requiring Twitter to arbitrate at JAMS, and which did not.

11.     Twitter therefore objected to those claimants' attempt to offload to Twitter the responsibility for determining whether the claimant had a good-faith

---

[4] *See* Twitter's Request for a Universal Discovery Protocol, attached hereto as **Exhibit 4**.
[5] The dates here are drawn from my review of the DRAs and offer letters of former twitter employees who have retained my firm for their litigation against Twitter, which allowed me to identify the approximate times that Twitter made changes to those documents.

basis to demand arbitration with JAMS. D.I. 13-1 at 2 ("Without an actual signed and dated copy of an arbitration agreement between a specific claimant and Twitter agreement, no legitimate basis exists for JAMS to conclude that these specific claimants and Twitter agreed to arbitration before JAMS.").

12.     Unsurprisingly, JAMS agreed that arbitration demands that merely attached an unsigned, undated template form and did not make individualized allegations about the specific claimants were insufficient to confer jurisdiction on JAMS. D.I. 13-2. JAMS went further, stating that given these filings, it would only proceed where "a Claimant's Demand includes a signed agreement naming JAMS or a court order identifying JAMS as applicable to the Claimant".

13.     Defendants apparently took that as a license to object to arbitrating at JAMS *even for claimants who specifically identified themselves* as having executed a DRA specifying arbitration at JAMS and who noted that they signed their offer letter (and therefore the DRA) after Twitter had updated its DRA to specify JAMS.

14.     Revealing the bad faith of those objections, Defendants' objection letters to JAMS were extremely carefully worded to avoid suggesting that Twitter denied the existence of the DRA.[6] Indeed, in each instance, Defendants professed a willingness to check the files that would confirm that Claimants had a DRA

---

[6] *See, e.g.,* **Exhibit 5,** which is a true and correct copy of an objection we received to a client who had not located her fully executed DRAs; see also D.I. 13-3.

providing for arbitration with JAMS, but only upon separate request by each claimant for a copy of the DRA.

15.    There was no purpose to Defendants' objection to JAMS' jurisdiction and insistence on that process of a separate request other than to cause delay. The process by which Defendants would check each employee's client file and confirm the existence of the DRA was no different when it occurred in response to a request by the employee for a copy of their file than it would have been to check the same file and confirm the obligation to arbitrate.  Yet Defendants insisted that they would not arbitrate with any claimant who had not either preserved their own copy of the fully executed DRA, or separately requested – and received – it from Twitter.

16.    This was no small hurdle for the former Twitter employees. Rather, Twitter had erected substantial barriers to the employees' ability to successfully request *anything* from the company, and its counsel refused to commit to *any* timeline on which such requests would be processed or honored.

17.    On April 23, 2023, in an attempt to resolve this issue and obviate future disputes, I proposed to Defendants' counsel that for each of our clients who were unable to locate their signed DRA, Defendants' counsel would inspect Twitter's personnel files within a week of an emailed request and either provide us with the signed DRA or confirm that there was none. Defendants' counsel rejected

this proposal. In the days that followed, I proposed several alternate procedures in an attempt to resolve this problem; Defendants' Counsel rejected all of them. On May 4, 2023, Defendants' counsel finally made it clear that my clients were on their own, saying, "Your clients can send an email to People Questions to request their DRAs, as they always have been [sic]." He also said that if counsel emailed him a list, he would "do his best" to follow up. But he would not provide any sort of timeline for any such follow up, despite multiple prior requests for such a timeline. A true and correct copy of this email thread is attached hereto as **Exhibit 6.**

18.     The People Questions email address (peoplequestions@twitter.com) was not a functional way to receive information from Twitter. One of my clients emailed People Questions on April 21, 2023, and was directed to a Google form in lieu of a substantive response. That Google form, when launched, stated "The form People Questions Submission Form is no longer accepting responses. Please contact the owner of the form if you think this is a mistake." A true and correct copy of this email with the sender's personally identifying information redacted is attached hereto as **Exhibit 7.**

19.     Nonetheless, our clients who were lacking their DRAs dutifully emailed People Questions as requested by Defendants' counsel in the first week of May 2023. All of them received an apparently automated reply informing them

7

that their requests would be completed within five to seven days. As of the date of this declaration, only one of them has received any response at all.

20.    Continuing the efforts to obtain our clients' fully executed DRAs, my office emailed Defendants' counsel on May 17, 2023, informing them that emailing People Questions had not produced the promised results. This email went unanswered for several days; on May 22, 2023, my office sent a follow-up email. On May 23, 2023 – exactly one month after I had first requested Defendants' counsel's assistance locating my clients' DRAs -- Defendants' counsel responded with all but one of the requested DRAs and explained, "The process Eric describes below will work, but in these cases it appears to have taken a bit longer than anticipated." For the final client, Defendants neither provided the requested DRA nor confirmed that there was no DRA in the client's files. To this day, Defendants refuse to concede that their inability to locate an executed DRA in his file means that no such agreement exists, and instead insist that this client must wait an unspecified amount of additional time while Twitter engages in unspecified further activity in an attempt to "locate" his DRA. A true and correct copy of this email thread is attached hereto as **Exhibit 8**.

21.    Encouraged by Defendants' counsel's representation that the process "would work", another of my clients emailed PeopleQuestions to request her fully executed DRA on May 26, 2023. A true and correct copy of her email with her

personally identifying information redacted is attached hereto as **Exhibit 9**.
Despite Defendants' counsel's promises, she never received a response.

22.     My office emailed Defendants' counsel in a last-ditch effort to obtain
this client's DRA on June 7, 2023.[7] We never received a response; as of the date of
this declaration, we have been unable to obtain this client's DRA.

### III.   Mr. Woodfield's Attempt to Arbitrate with Defendants

23.     On or about May 5, 2023, my office filed 33 demands for arbitration
with JAMS, including one for Mr. Woodfield. In that demand, Mr. Woodfield
specifically alleged that he recalled executing the DRA as part of his onboarding
process and that the DRA attached to the demand as an exhibit, while unsigned by
Mr. Woodfield, was taken from the onboarding paperwork included with his offer
letter. Mr. Woodfield also alleged his date of hire, which was May 18, 2020.[8]

24.     That date of hire was after the date on which Twitter updated its DRA
to include arbitration with JAMS, and after the date that, according to Defendants'
sworn testimony before the Northern District of California, Twitter had developed
an automated process by which it ensured that all employees had executed their
DRA before commencing employment at Twitter.[9] Indeed, Defendants have

---

[7] A true and correct copy of this email, with the client's personally identifying information redacted, is attached hereto as **Exhibit 10**.
[8] Attached hereto as **Exhibit 11** is a true and correct copy of Mr. Woodfield's Demand for Arbitration.
[9] *See* "Declaration of Fidelma Callaghan," D.I. 18-1 in *Cornet v. Twitter,* D. Del Case No. Case 1:23-cv-00441-CFC (Nov. 11, 2022), at ¶ 6. A true and correct copy of this declaration is attached hereto as **Exhibit 12** for the Court's convenience.

confirmed that Twitter maintains executed declarations in easily accessible files as part of their regular course of business.[10]

25.     JAMS accepted the filing, invoiced Mr. Woodfield for his share of the filing fees, received payment on that invoice, and issued an invoice dated May 8, 2023 to Defendants, due upon receipt, for their share of the initial filing fees.

26.     Nevertheless, on May 22, 2023, Defendants objected to proceeding with arbitration with Mr. Woodfield and asked JAMS to decline jurisdiction over his claims along with those of another of his colleagues who had likewise been unable to locate her DRA and had made similar representations as to its execution as those made by Mr. Woodfield. D.I. 13-4 at 2.

27.     While his colleague wished to proceed with arbitration, Mr. Woodfield elected to accept Defendants' conduct as the breach of the arbitration agreement that it was, and therefore did not oppose Defendants' objection. JAMS accordingly closed Mr. Woodfield's file.

## IV.     Defendants' Most Audacious Delay Tactic Yet

28.     On June 28, 2023, Defendants identified its most successful delay tactic to date. After months of acknowledging that they owed fees under the DRA, which provided for arbitration with JAMS pursuant to the JAMS Employment Rules and Procedures and JAMS' application of the Minimum Standards to

---

[10] *Id.*

arbitrations brought pursuant to that DRA, Defendants suddenly decided that they would no longer pay such fees, grinding well over a thousand arbitrations filed against them to a sudden halt. Despite the efforts described below, those arbitrations remain on hold to this day.

29.    And Defendants did, in fact, comply with the Minimum Standards for months. The first arbitrations against Twitter were filed in 2022; since that time, JAMS has consistently applied the Minimum Standards to the arbitrations brought under the DRA. That application has been reflected throughout the process, beginning with the very first invoice issued by JAMS in each arbitration. Under normal JAMS rules, Claimants must pay a $2,000 case initiation fee. In arbitrations subject to the Minimum Standards, however, JAMS will only invoice Claimants $400, and will invoice the balance to Respondents. JAMS did just that in each of the more than 1,000 demands for arbitration filed in connection with claims similar to those alleged in this action, invoicing each Claimant $400 and invoicing the balance to Respondents in every case. For six months, until June 2023, Defendants paid, albeit late, each invoice issued to them: for case initiation fees, for arbitrator deposit fees, or otherwise. JAMS issued many of these invoices to Defendants after expressly providing Defendants with notice that it would apply the Minimum Standards to these arbitrations and would therefore be invoicing Defendants for all future arbitral fees. JAMS' notice to Defendants also specifically informed

11

Defendants that proceeding with the arbitration and paying those invoices would constitute Defendants' consent to the application of the Minimum Standards. Attached hereto as **Exhibit 13** is a true and correct copy of one such JAMS notice from another of our clients' arbitrations.

30.     Despite that, and despite Defendants' contention on this motion that any dispute about the Minimum Standards needed to be heard by individual arbitrators appointed in each individual case, on June 2, 2023, Defendants filed a letter with JAMS as an organization asking JAMS to reconsider its application of the Minimum Standards to *all* of the arbitrations filed under the DRA, and incorrectly arguing that application of the Minimum Standards violated the DRA. D.I. 13-8.

31.     Plaintiff's counsel, and each of the firms representing potentially affected claimants, opposed.[11] On June 21, 2023, JAMS reiterated that it would apply the Minimum Standards to any arbitration brought under a DRA that Twitter had required employees to sign as a condition of beginning their employment at Twitter. D.I. 13-9.

32.     In response, on June 28, 2023, Defendants provided their notice that they would no longer pay fees in those arbitrations or participate in them. D.I. 13-10.

---

[11] A true and correct copy of Plaintiff's counsel's opposition is attached hereto as **Exhibit 14**.

33.     In response to that refusal, I inquired of the JAMS case administrator whether JAMS would allow the arbitrator to rule on a motion to construe the DRA and determine whether Defendants were obligated to abide by the Minimum Standards under the terms of the DRA, if that motion was brought in one of the cases in which one of my clients had an arbitrator appointed and in which Defendants had already paid the initial deposit towards the arbitration fees. JAMS responded that they could not bill such fees entirely to Defendants absent their consent.

34.     I then asked whether JAMS would allow such an arbitrator to rule on such a motion if one of those claimants advanced a matching fee deposit so that fees for the motion could be billed equally to all parties, as Defendants contended they were required to be. Though that proposal appears to be exactly what Defendants *vehemently* argue in their motion they should be entitled to as a method of resolving the dispute over the fees, Defendants *just as vehemently* objected to it in their response to JAMS.[12]

35.     In fact, Defendants were *so* opposed to an arbitrator actually deciding the fees issue that when JAMS agreed with my proposal to allow a claimant to advance fees so that the matter could be heard by an arbitrator, they filed a

---

[12] *See* **Exhibit 15**, a true and correct copy of Defendants' counsel's email to JAMS in objection.

separate, formal objection to allowing the arbitrator to construe the DRA. A true and correct copy of this objection is attached hereto as **Exhibit 16.**

36.     But the objections did not stop there. The Arbitrator proceeded with a pre-motion conference and at that conference, Defendants' counsel strenuously objected to the arbitrator even considering the motion, continuing to argue that the claimant in that matter had no right to an award declaring the meaning of the DRA on this disputed issue, and that the motion should only proceed if the claimant was willing to agree in advance that he waive the Minimum Standards if the Arbitrator ruled that the DRA required fee-splitting.

37.     Defendants' counsel also argued at that conference that the appropriate forum to resolve this dispute was Federal Court, via a petition to compel arbitration under Section 4 of the FAA.

38.     At that conference, I asked Defendants' counsel to commit that if Claimant brought a Section 4 petition, Defendants would not argue that since the DRA delegates fee issues to the arbitrator, the reviewing court's jurisdiction extended only to compelling arbitration and would not allow the court to construe the DRA to require the application of the Minimum Standards. Defendant's counsel declined to do so.

39.     The motion is fully briefed before the Arbitrator and pending. Copies of the parties' briefs are attached hereto as **Exhibits 17-19**. As reflected in Exhibit

14

18, Defendants continued to object to the arbitrator issuing any sort of ruling construing the DRA to determine whether it required Respondents to abide by the minimum standards. Ex. 18 at 6.

40.    I note, again, that in *this* Court, Defendants have contended that Plaintiff is trying some procedural trick to deprive Defendants of their right to have the dispute over fees determined by an arbitrator. Opp. at 18 ("Because the DRA clearly commends these disputes to the arbitrator for resolution on an individual basis, Plaintiff has placed Twitter in an unusual situation—one in which Twitter must either simply waive its right to arbitrate this dispute in accordance with the DRA's terms, and accept a judicial resolution, or must assert its right to arbitrate and keep silent as to the substance of Plaintiff's many flawed allegations and legal theories because the DRA leaves those issues to the arbitrator."). With the greatest of respect for my colleagues on the other side of this action, it is not logically possible that both these contradictory positions could be advanced in good faith. They have taken these positions even though I specifically warned them that if they took a mutually contradictory position in court, it would potentially be a basis for sanctions under § 1927. It cannot be the case that Defendants simultaneously want the fee dispute to be addressed by an arbitrator, as they represent to this Court, and also do not believe that the Arbitrator *can* address the fees dispute, which is the argument they are making in the Zhang arbitration.

## V. Conclusion

41.    In sum, Defendants have engaged in an overt and unceasing campaign to delay litigation of the claims at issue here. They have done so by declining to timely pay invoiced arbitration fees. They have done so by refusing to arbitrate with claimants, like Mr. Woodfield, with whom they have a DRA. They have done so on a mass scale by refusing to abide by JAMS' interpretations of their own rules as the arbitral body Twitter chose and whose rules it bound itself to follow. And they have even done so by advancing mutually contradictory positions in arbitration and before this Court. On this record, Defendants cannot compel arbitration and the motion should be denied.

Executed this 28th day of September in Thornhill, Ontario.


_____
Akiva M. Cohen